UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON

IN RE TRASYLOL PRODUCTS LIABILITY
LITIGATION – MDL-1928

This Document Relates to:
*Crystal Fast v. Bayer Corp., et al.,*
Case No. 9:08-cv-80613
_____/

**BAYER'S MOTION FOR SUMMARY JUDGMENT AND
TO EXCLUDE EXPERT TESTIMONY OF DR. CARL J. BLOND,
AND COMBINED MEMORANDUM OF LAW IN SUPPORT**

Pursuant to Rule 702 of the Federal Rules of Evidence Defendants Bayer Corporation and Bayer HealthCare Pharmaceuticals Inc. (as successor in interest to Bayer Pharmaceutical Corporation) (collectively, "Bayer")[1] move to exclude the testimony of plaintiff's sole specific causation expert, Dr. Carl J. Blond.  Because plaintiff has no admissible expert testimony on causation, she has failed to establish a genuine issue of material fact as to whether Trasylol caused decedent's alleged injuries. In addition, many of plaintiff's claims suffer from additional defects that also mandate their dismissal.   Accordingly, Bayer moves for summary judgment on all claims asserted by plaintiff.

**MEMORANDUM OF LAW**

Marguerite Findo, 78, had a history of Stage 3 chronic kidney disease, diabetes, congestive heart failure, high blood pressure, and other health problems when she had quadruple bypass and valve replacement surgery in April of 2005.  Because her surgery was very complex, Mrs. Findo was on the cardiopulmonary bypass machine for a very long time:  three hours and

---

[1] Although plaintiff's complaint names "Bayer A.G." as a defendant, this entity was never served and thus is not a party to this action. *See* Complaint [D.E. 2.2 in 9:08-cv-80613].

three minutes.  During and after surgery she suffered from persistently low blood pressure.  On the day after surgery, Mrs. Findo started dialysis and began developing serious, body-wide infections.  She was placed on a ventilator, and died on June 12, 2005.  Mrs. Findo's doctors do not blame Trasylol for her death.  Her daughter, plaintiff Crystal Fast, therefore has hired Dr. Carl Blond to support her claim.

Dr. Blond, however, testified that Mrs. Findo could have gone into kidney failure without ever having received Trasylol because of her many other risk factors for kidney failure.  Deposition of Carl J. Blond, M.D. ("Blond Dep.") (Ex. A)[2] at 85:2-9; 90:3-7.  He also testified that he could not discern what role Trasylol purportedly played in causing Mrs. Fast's kidney failure.  *Id.* 85:10-86:9; 86:19-87:14.  Nevertheless Dr. Blond opines that "aprotinin was a primary contributor in all medical certainty to the development of acute kidney injury in Ms. Findo."  Report of Carl J. Blond, M.D. ("Blond Report") (Ex. B) at 3.

Dr. Blond's admissions make his causation opinion unreliable and inadmissible under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and *Guinn v. AstraZeneca*, 602 F.3d 1245 (11th Cir. 2010).  In addition, West Virginia is a "but for" causation jurisdiction, and Dr. Blond's testimony, even if it were admissible, identifies Trasylol as no more than a potential contributor to Mrs. Findo's kidney failure.[3]  This is insufficient as a matter of law.  These and other deficiencies mandate summary judgment in Bayer's favor.

---

[2] Bayer's Statement of Material Facts pursuant to Southern District of Florida Local Rule 7.5(c) has been filed simultaneously and is incorporated herein by reference.  Exhibits referenced herein are attached to the Statement of Material Facts.

[3] West Virginia tort law applies because the case was filed in West Virginia and Mrs. Findo's alleged injury occurred in West Virginia.  *See Paul v. Nat'l Life*, 352 S.E.2d 550, 555 (W. Va. 1986) (in general West Virginia applies the "place of wrong" conflicts of law doctrine); Amended Complaint [D.E. 30 in 9:08-cv-80613] ¶¶ 40-47 (alleging injury caused in the state of West Virginia).

2

**BACKGROUND**

A. **Mrs. Findo's Pre-Surgery Health Problems.**

Even before her extended and complex open heart surgery, Mrs. Findo was in poor health, and plaintiff's expert concedes that Mrs. Findo's pre-existing conditions increased her risk for kidney failure. These risk factors include:

*Diabetes*. Mrs. Findo suffered from type-2 diabetes for at least six years before her surgery. Plaintiff's Response to First Request for Admission No. 12 (Ex. C); Deposition of Crystal Fast ("Fast Dep.") (Ex. D) at 91:14-16. Diabetes is the number one cause of renal failure. Deposition of Chirag Parikh, M.D. ("Parikh Dep.") (Ex. E) at 166:2-4. Dr. Blond testified that pre-existing diabetes is a risk factor for post-operative kidney failure. Blond Dep. (Ex. A) at 32:3-13.

*Stage 3 Chronic Kidney Disease*. Dr. Blond admitted that Mrs. Findo had chronic kidney disease at the "upper end" of Stage 3. Blond Dep. (Ex. A) at 55:10-64:21; 65:1-10; 68:2-8. Dr. Blond agreed that that he could not rule out Mrs. Findo's "pre-existing chronic kidney disease as a potential contributing cause of her post-operative renal failure." *Id.* at 68:17-24.

*Peripheral Vascular Disease.* Dr. Blond conceded that Mrs. Findo had this condition, that it increased her risk of kidney failure, *id*. at 49:24-50:10, and that he did not rule it out as a potential contributing cause of her kidney failure:

> Q. Doctor, is it fair to say that you did not rule out peripheral vascular disease as a potential contributing cause of the patient's post-operative renal failure?
>
> A. Yes, sir. I don't believe I had that information at the time of my report from her prior records.

*Id.* at 67:1-7.

*Congestive Heart Failure*.  Mrs. Findo was diagnosed with congestive heart failure in 2003.  *Id.* at 58:19-22.  Congestive heart failure is a risk factor for post-operative kidney failure.  *Id.* and at 70:10-16.

*Hypertension*.  After diabetes, high blood pressure is the second leading cause of chronic kidney disease.  Parikh Dep. (Ex. E) at 167:11-18.  Echoing Dr. Parikh, Dr. Blond testified that high blood pressure was an "obvious potential risk factor[]" for Mrs. Findo.  *Id.* at 83:2-23.  To the best of plaintiff's memory, her mother's high blood pressure was untreated:

> A.     -- she was not on any high blood pressure medication that I can recall.
>
> Q.     At any time?
>
> A.     Not that I can recall.

Fast Dep. (Ex. D) at 90:17-20; 136:20-23 ("Q.  And I think it was your testimony earlier that to your knowledge she was not treated for hypertension prior to her admission for the surgery?  A. Not that I can recall.").

*Age and Gender*.  Mrs. Findo was a 78-year-old woman at the time of her surgery.  Dr. Blond described this as "a very old age."  Blond Dep. (Ex. A) at 101:9.  Dr. Blond also testified that this combination of age and gender increased her risk for post-operative renal failure:

> Another potential risk factor statistically is her female sex and her age, which are two risk factors that really we have no control over, I should mention.

*Id.* at 83:21-23.  *See id.* at 46:19-47:2 ("Q.  Is 78 an age that is associated with an increased risk of renal failure post-operatively?  A.  Yes.").

4

### B. Complications During Mrs. Findo's Surgery.

Mrs. Findo's long, complex surgery, more than three hours on cardiopulmonary bypass, and persistently low intra-operative blood pressure (hypotension) placed her already compromised kidneys at greater risk of failure.

*Length of Surgery, Time on Bypass, and Surgical Complexity.* Dr. Jose Cruzzavala, Mrs. Findo's cardiac surgeon, described her valve replacement and quadruple bypass surgery as long and "very complex." Deposition of Jose Cruzzavala, M.D. ("Cruzzavala Dep.") (Ex. F) at 87:14-88:5. The surgery itself lasted approximately five hours and the cardiopulmonary bypass machine breathed for Mrs. Findo and pumped her blood for over three of those hours. *Id.* at 89:11-20. Dr. Blond conceded that Mrs. Findo's long surgery, the complexity of that surgery, and her very long time on the heart lung machine increased her risk of kidney failure. Blond Dep. (Ex. A) at 45:3-46:2.

*Surgical Hypotension.* All organs, including the kidney, depend on adequate blood pressure to maintain the flow of oxygenated blood. The more blood pressure drops below its baseline level, the greater the threat to the kidney. *Id.* at 47:3-48:14. And when mean arterial pressures drop below 60, the kidney's ability to auto-regulate blood flow to itself drops. *Id.* at 74:16-75:7. Dr. Blond testified that persistently low pressures are bad for the kidney and can lead to kidney failure. *Id.* at 75:5-10.

Dr. Blond testified that Mrs. Findo's blood pressures were persistently low both during surgery (pre-bypass and during bypass) and immediately after:

*Hypotension During Surgery (Pre-Bypass)*

> Q. Do you acknowledge that she had hypotension intra-operatively prior to going on cardiopulmonary bypass?

5

> A.     \*\*\* But, yes, I mean relative to where she started at at 150, she dropped down to – into the 90-100 range.
>
> Q.     What was the timing of the 150 marker that you mentioned?
>
> A.     That was at her beginning of anesthesia. \*\*\*
>
> Q.     And when did her hypotension begin?
>
> A.     \*\*\* I would say about 9:30 [am].
>
> Q.     And that hypotension persisted until she went on the bypass; is that right?
>
> A.     Yes.

*Id.* at 71:10-72:16.

*Hypotension While On, and After, Bypass*

> Q.     What was the nadir of her blood pressure readings during that period?
>
> A.     It looks roughly about 88 systolic.
>
> Q.     And what was the diastolic?
>
> A.     Between 40 and 50.
>
>        \* \* \*
>
> Q.     How did her blood pressure fare when she came off of cardiopulmonary bypass?
>
> A.     She's in the range of approximately 90 to 100 systolic, and, I believe 40 to low 50's diastolic.
>
> Q.     And so she remains hypotensive during that period of time?
>
> A.     Yes.

*Id.* at 72:17-21;73:2-8.

       **C.**     **Mrs. Findo's Post-Surgery Complications.**

Mrs. Findo's post-surgery complications increased her risk for kidney disease even after her long, complex surgery had ended.

*Continued Hypotension.* The low blood pressure Mrs. Findo experienced during and immediately after surgery continued post-operatively. *Id.* at 73:23-75:4. Dr. Blond described Mrs. Findo's low blood pressure as "persistent" and observed that persistent low blood pressure "decreased perfusion to the organ that's being auto-regulated, whether it's the brain or the kidneys . . ." *Id.* at 74:9-13, 74:25-75:7.

Dr. Blond did not believe Mrs. Findo's blood pressure was adequately maintained following surgery and concluded that it was "a contributing cause that goes very often with a bypass surgery itself." *Id.* at 76:9-10; *see also id.* at 76:12-14 ("I would consider the hypotension as a potential contributing cause, yes."). Indeed, he concluded that medications that were administered to counter this problem, while necessary, could themselves have increased her risk for kidney failure. *Id.* at 77:24-78:8.

*Sepsis and Adult Respiratory Distress Syndrome ("ARDS").* Dr. Cruzzavala testified that Mrs. Findo began developing serious infections the day after surgery. These infections made it difficult for Mrs. Findo to provide adequate oxygen to her organs. Cruzzavala Dep. (Ex. F) at 123:24-127:8. Her infections worsened until she developed sepsis, a "systemic infection" that also makes it difficult to provide oxygen to the organs. *Id.* at 127:9-16. Dr. Blond testified that sepsis (1) can damage the kidneys, (2) can contribute to ongoing renal failure, and (3) and can inhibit the body's ability to recover from renal failure. Blond Dep. (Ex. A) at 81:4-16.

*Low Cardiac Output.* Following surgery, Mrs. Findo's heart was unable to pump enough blood to her organs, a condition known as low cardiac output. Mrs. Findo's cardiac index, a measure of her cardiac output, was trending down, and in Dr. Cruzzavala's words, "as the day progressed … she was worse and worse." Cruzzavala Dep. (Ex. F) at 109:3-111:13. Dr.

7

Blond acknowledged Mrs. Findo's low cardiac output "may have played a role" in her kidney failure. Blond Dep. (Ex. A) at 97:16-98:7.

*Platelet Consumption/Disseminated Intravascular Coagulopathy ("DIC").* Following surgery, Mrs. Findo's platelets began dropping precipitously necessitating "massive [blood] transfusions." *Id.* at 91:7-93:17. Dr. Blond conceded that this problem contributed to Mrs. Findo's continuing kidney failure. *Id.*

## ARGUMENT

"[T]he requirement of reliability found in Rule 702 [is] the centerpiece of any determination of admissibility." *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002). Every step of a proffered expert's analysis must be supported by good grounds. "*[A]ny* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005) (emphasis in original); *accord Kilpatrick v. Breg, Inc.*, No. 08-10052-CIV, 2009 WL 2058384, at *3 (S.D. Fla. June 25, 2009) *aff'd* 613 F.3d 1329 (11th Cir. 2010) ("if the court determines that any step in the expert's chain of logic is unreliable, his entire opinion must be excluded").

Dr. Cruzzavala, Mrs. Findo's cardiac surgeon, cannot say that Trasylol caused either Mrs. Findo's kidney failure or death. Cruzzavala Dep. (Ex. F) at 121:2-7; 135:1-5. Plaintiff's only causation evidence, therefore, is the testimony of Dr. Blond. Dr. Blond – who has never prescribed, studied, researched, or taught anyone about Trasylol – asserts that Trasylol was "a primary contributor" to Mrs. Findo's kidney disease. Deposition of Carl J. Blond, M.D., in *Rodriguez* (Ex. G) at 39:14-40:2, 47:17-19, 48:4-5; Blond Dep. (Ex. A) at 35:3-18. He also asserts that Trasylol contributed to Mrs. Findo's death, but only insofar as he contends that it first contributed to her kidney failure. Blond Dep. (Ex. A) at 102:23-103:1.

Dr. Blond's opinions should be excluded because they are not based on a systemic and scientifically reliable differential diagnosis. *See Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 598-99 (N.D. Fla. 2010) (discussing requirement of differential diagnosis).[4] To the contrary, Dr. Blond cannot justify his opinions by reference to anything other than his own "say so." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *Guinn v. AstraZeneca*, 602 F.3d 1245, 1255 (11th Cir. 2010). Without Dr. Blond's testimony, plaintiff cannot create a triable issue on causation – an element of each of her causes of action[5] – and cannot survive this motion for summary judgment. *Rohrbough v. Wyeth Labs., Inc*., 719 F. Supp. 470, 473 (N.D.W. Va. 1989) (expert testimony necessary to prove causation); *Farley v. Shook*, 629 S.E.2d 739, 744-745 (W. Va. 2006) (expert testimony necessary to prove causation in "complex matters of diagnosis and treatment").

---

[4] The terms "differential diagnosis" and "differential etiology" have been used interchangeably by the courts. *Compare, e.g., Hendrix v. Evenflo Co*., 609 F.3d 1183, 1195 (11th Cir. 2010) (discussing the components of a differential etiology) *with Glastetter v. Novartis Pharms. Corp.*, 252 F.3d 986, 989, 992 (8th Cir. 2001) (discussing the same components of a differential diagnosis). Both are used in this context as the method doctors use of first identifying all potential of an injury and then systematically ruling them out based on the medical evidence until the most likely cause remains.

[5] Under West Virginia law, each of plaintiff's claims requires proof of proximate causation. *See generally Tolley v. Carboline Co.*, 617 S.E.2d 508, 511-12 (W. Va. 2005) ("[T]here is one requirement that exists in a deliberate intent cause of action that also exists in [negligence, failure to warn, breach of warranty, and strict liability claims]. That requirement is proximate cause."); *Brady v. Deals on Wheels, Inc*., 542 S.E.2d 457, 464-65 (W. Va. 2000) (negligence); *Morningstar v. Black & Decker Mfg. Co.,* 253 S.E.2d 666, 680 (W. Va. 1979) (strict liability); *Jennings v. Farmers Mut. Ins. Co*., 687 S.E.2d 574, 579-580 (W.Va. 2009) (misrepresentation); *Lengyel v. Lint*, 280 S.E.2d 66, 69 (W. Va. 1981) (fraud); *Horan v. Turnpike Ford, Inc.,* 433 S.E.2d 559, 565 (W. Va. 1993) (express warranty); *Jones, Inc. v. W.A. Wiedebusch Plumbing & Heating Co.*, 201 S.E.2d 248, 254 (W. Va. 1973) (implied warranty); *Higgins v. Am. Honda Motor Co., Inc*., 974 F.2d 1331, *2 (4th Cir. 1992) (failure to warn); *Harless v. First Nat'l Bank in Fairmont,* 289 S.E.2d 692, 694-695 (W. Va. 1982) (intentional infliction of emotional distress).

I.  **DR. BLOND'S OPINION THAT TRASYLOL CONTRIBUTED TO MRS. FINDO'S KIDNEY FAILURE SHOULD BE EXCLUDED BECAUSE IT IS NOT SCIENTIFICALLY RELIABLE.**

Dr. Blond did not rule out any of the contributing factors discussed above. In fact, he testified that *all* of them contributed to Mrs. Findo's kidney failure. Simply assuming that all *possible* causes must be *actual* causes does not constitute a reliable methodology for determining causation. *Guinn*, 602 F.3d at 1255. Dr. Blond stated: "Basically, I don't think in any of these cases there's a single mechanism. I think it's usually a mixture." Blond Dep. (Ex. A) at 77:15-17; s*ee id*. at 87:7-14. Furthermore, Dr. Blond was unable to discern what role Trasylol might have played in this "mixture":

> Q. Is there any specific test or marker that you can use to determine – that tell[s] you aprotinin was a cause of her renal failure?
>
> A. There is not . . . [B]ut I would say in clinical practice even … you really can't differentiate. There's not a specific test, and I don't expect there ever will be at least one that would tell us specifically which injury was the most severe in a given patient.

*Id.* at 85:10-18. And Dr. Blond could not, without guessing, discern how responsible Trasylol – as opposed to Mrs. Findo's many other health problems – was for her kidney failure:

> Q. Are you able to quantify in what way you believe aprotinin contributed to this patient's renal failure?
>
> A. I can't give a percentage. I think I would be guessing if I tried to give you a percentage. I think that when there is an injury to the kidney from a toxin, it loses some of its remarkable ability to auto-regulate blood flow and to compensate. And so, again, the multiple hits, and we see this very often in nephrology that it's not one thing. It's a combination of things.

*Id.* at 84:17-85:1.

Not surprisingly, Dr. Blond was also unable to say that Mrs. Findo would *not* have developed renal failure had she not received Trasylol during surgery:

> Q. And given this patient's risk factors, which we have discussed, is it fair to say that you cannot rule out the possibility that even if she had – if aprotinin had not been used in her surgery, that she would … still have developed acute renal failure post-operatively?
>
> A. There's certainly a risk of that even without aprotinin.

Blond Dep. (Ex. A) at 85:2-9.

> Q. And you can't say that [Mrs. Findo's kidney failure] wouldn't have happened if she didn't have aprotinin at all; is that right?
>
> A. I can't say that it could not have happened. That's correct.

*Id.* at 90:3-7.

Unable to discern how Trasylol might have contributed to Mrs. Findo's kidney failure, unable to identify how much Trasylol might have contributed to her kidney failure, and unable to say that she would not have developed kidney failure but for Trasylol, Dr. Blond nevertheless opines that Trasylol caused Mrs. Findo's renal failure: "[I]t's unlikely I would have expected her to . . . develop oliguric renal failure, and I think the drug that tips the scale is a drug such as aprotinin . . ." *Id.* at 85:24-86:2. Dr. Blond, however, quickly equivocated on even this "expectation":

> … there's a lot of literature regarding aprotinin, but you can't in a given … case, you can't absolutely rule in or rule out a drug toxin. There's simply no test to do that and that's why sometimes its hard to – to quantitate in a given patient what one drug will do.

*Id.* at 86:4-9.

Under the Eleventh Circuit's decision in *Guinn*, opinions such as Dr. Blond's are prohibited under *Daubert*. In *Guinn,* plaintiff's expert, Dr. Jennifer Marks, opined that plaintiff had developed diabetes due to weight gain caused by the prescription medication Seroquel. Dr. Marks, like Dr. Blond here, testified that she knew of no methodology to rule out alternative causes of plaintiff's diabetes. *Guinn*, 602 F.3d at 1249. She, like Dr. Blond here, agreed that

11

plaintiff's other risk factors alone were sufficient to explain plaintiff's diabetes. *Id.* at 1249-50. In affirming the trial court's exclusion of Dr. Marks under *Daubert* and Rule 702, the Eleventh Circuit explained that an expert "cannot merely conclude that all risk factors for a disease are substantial contributing factors in its development." *Id.* at 1255. Multiple potential causes notwithstanding, the expert must provide an "explanation of how she concluded that, based on reasonable medical probability," the drug at issue caused the plaintiff's injury "despite . . . other possible explanations." *Id.*

In light of Mrs. Findo's many other uncontested risk factors – factors that Dr. Blond himself conceded were substantial contributing factors – Dr. Blond, like Dr. Marks in *Guinn*, did not provide a scientifically reliable basis for concluding that Trasylol contributed to Mrs. Findo's kidney failure. To the contrary, he admitted that Mrs. Findo's other risk factors were sufficient, by themselves, to explain her renal failure. Blond Dep. (Ex. A) at 85:2-9; 90:3-7. And he could not quantitatively assess the role these other factors played as is required to support any scientifically reliable "more likely than not" opinion. *Guinn*, 602 F.3d at 1255; *McDowell v. Brown*, 392 F.3d 1283, 1300-01 (11th Cir. 2004) (excluding specific-causation testimony from experts who failed to "mete out" various contributors or "quantify" their effect on plaintiff's injuries).

Courts applying *Daubert* have repeatedly excluded the specific-causation testimony of experts like Dr. Blond who simply "conclude that all risk factors for a disease are substantial contributing factors in its development." *Guinn*, 602 F.3d at 1255; *see also General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an

12

analytical gap between the data and the opinion proffered."); *McDowell,* 392 F.3d at 1301-02 ("[A]n expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions . . . ").  Because Dr. Blond has failed to employ a scientifically reliable methodology for rendering a causation opinion, his opinion regarding the cause of Mrs. Findo's kidney failure should be excluded.  And because causation is an element of each of plaintiff's claims (*see supra*, note 5), summary judgment should be entered in favor of Bayer.

**II.     DR. BLOND'S DEATH OPINION SHOULD BE EXCLUDED.**

Dr. Blond's report contains no opinion about the cause of Mrs. Findo's death. Blond Dep. (Ex. A) at 100:21-101:18.  During his deposition, however, Dr. Blond claimed that while that Trasylol did not directly cause Mrs. Findo's death, *id.* at 102:1-2, it indirectly contributed to the extent it contributed to her kidney failure.  *Id.* at 102:3-5.  He conceded that, if Trasylol did not contribute to Mrs. Findo's kidney failure, it did not contribute to her death:

> Q.     And so you would agree that if aprotinin did not contribute to her renal failure, then aprotinin did not contribute to her death.
>
> A.     That's my opinion, yes.

*Id.* at 102:23-103:1.

As explained above, Dr. Blond's testimony that Trasylol was a cause of Mrs. Findo's kidney failure is scientifically unreliable and, therefore, inadmissible.  As a result, his death opinion is similarly infirm and should also be excluded.

**III.    DR. BLOND'S KIDNEY FAILURE OPINION IS INSUFFICIENT UNDER WEST VIRGINIA'S "BUT FOR" CAUSATION STANDARD.**

West Virginia law provides a reason independent of *Daubert* for granting this motion.  Under West Virginia law, plaintiff must prove by a preponderance of the evidence that defendant's breach of duty was the proximate cause of plaintiff's injury.  *Louk v. Isuzu Motors,*

13

479 S.E.2d 911, 923 (W. Va. 1996) ; *see also Tolley*, 575 S.E.2d at 511-12.  Proximate cause is "that cause which in actual sequence, unbroken by any independent cause, produced the wrong complained of, ***without which the wrong would not have occurred***."  *Spencer v. McClure,* 618 S.E.2d 451, 456 (W. Va. 2005) (emphasis added) (citing *Webb v. Sessler*, 63 S.E.2d 65 (W. Va. 1950)); *Stewart v. George,* 607 S.E.2d 394, 398 (W. Va. 2004); *Wilkinson v. Duff*, 575 S.E.2d 335, 341 (W. Va. 2002).  *See also Brady*, 542 S.E.2d at 463 (W. Va. 2000) (describing proximate cause as "the last negligent act contributing [to the injury], ***without which such injury would not have resulted***.") (emphasis added).

As noted above, Dr. Blond has not testified and cannot testify that Trasylol is the factor without which Mrs. Findo's kidney failure would not have happened.  Indeed, he conceded that her kidney failure could have happened even without Trasylol.  Accordingly, and because proximate cause is an element of each count in plaintiff's Amended Complaint, plaintiff's claims fail as a matter of law.

## IV.   PLAINTIFF'S FRAUD CLAIM SHOULD BE DISMISSED.

Plaintiff's fraud claim (Count IV) also should be dismissed pursuant to this Court's March 5, 2009 [D.E. 809 in 1:08-md-1928] and April 2, 2009 [D. E. 916] Orders.  The March Order dismissed Count VI of the Master Complaint (constructive fraud) for failure to allege the fiduciary relationship required to prove constructive fraud.  D.E. 809 at 21-22.  That Order also required individual plaintiffs to plead fraud with specificity, *id.* at 14-15, holding that "Plaintiffs shall have thirty (30) days from the date of this Order within which to amend Count V of the Master Complaint [fraud] . . . to set forth any claim for fraud premised on any oral or written statement, other than packaging or written marketing materials, made to a Plaintiff or Plaintiff physician with the specificity required of Rule 9."  *Id.* at 12.

The Court's April 2009 Order held that, unless a plaintiff filed a response or otherwise amended his complaint within the appropriate time frame, "the common law fraud claims, if any, in the complaint will be dismissed in part in accordance with the March order, and the constructive fraud claims, if any, in the complaint will be dismissed in their entirety." D.E. 916 ¶ 2. This Order applied to all cases pending in the MDL, including this one. *Id.* ¶ 3.

Plaintiff did not file any type of response to either of these Orders and did not amend her complaint. Accordingly, Count IV should be dismissed.

## V. PLAINTIFF HAS ABANDONED HER EXPRESS AND IMPLIED WARRANTY CLAIMS.

Argument Section I showed that plaintiff's claims for breach of express and implied warranties (Counts V and VI) should be dismissed for failure to create a triable issue on causation. *See supra*, note 5. These claims also should be dismissed because they have been abandoned. Bayer's Sixth Interrogatory asked plaintiff whether she contended Bayer breached any warranties, express or implied, and, if so, to provide the basis for those contentions. Plaintiff responded that she "does not contend Bayer breached any warranty." Plaintiff's Response to Bayer's First Set of Interrogatories No. 6 (Ex. H). Accordingly, plaintiff has abandoned these claims and they should be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should exclude Dr. Blond's testimony under *Daubert* and Federal Rule of Evidence 702 and grant Bayer summary judgment on all of plaintiff's claims.

## RULE 7.1(a)(3) CERTIFICATION

As required by this Court's Local Rule 7.1(a)(3), counsel for defendants hereby certifies that counsel for the defendants has made reasonable efforts to confer in good faith with

15

counsel for all parties who may be affected by the relief sought in the motion, and has been advised that plaintiffs will contest this motion.

Dated:  October 29, 2010                          Respectfully submitted,

*/s/ Barbara Bolton Litten*
Patricia E. Lowry
Florida Bar No. 332569
E-mail:  plowry@ssd.com
Barbara Bolton Litten
Florida Bar No. 91642
E-mail: blitten@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL  33401-6198
Telephone:  561-650-7200
Facsimile:  561-655-1509

Philip S. Beck
Email:  philip.beck@bartlit-beck.com
Steven E. Derringer
Email:  steven.derringer@bartlit-beck.com
**BARTLIT BECK HERMAN PALENCHAR
    & SCOTT LLP**
54 W. Hubbard Street, Suite 300
Chicago, IL  60603
Telephone:  312-494-4400
Facsimile:  312-494-4440

Eugene A. Schoon
Email:  eschoon@sidley.com
Susan A. Weber
Email:  saweber@sidley.com
Craig A. Knot
Email:  cknot@sidley.com
**SIDLEY AUSTIN LLP**
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  312-853-7000
Facsimile:  312-853-7036

Susan Artinian
Email:  sartinian@dykema.com
Daniel Stephenson
Email:  dstephenson@dykema.com
**DYKEMA GOSSETT PLLC**
400 Renaissance Center
Detroit, MI  48243
Telephone:  313-268-9788
Facsimile:   313-568-6658

Richard K. Dandrea
Email:  rdandrea@eckertseamans.com
**ECKERT SEAMANS CHERIN & MELLOTT, LLC**
USX Tower, 600 Grant St., 44th Floor
Pittsburgh, PA.  15219
Telephone:  412-566-6000
Facsimile:   412-566-6099

*Attorneys for Bayer Corporation and*
*Bayer HealthCare Pharmaceuticals Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 29, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Barbara Bolton Litten*
Barbara Bolton Litten

**SERVICE LIST**

**In re Trasylol Products Liability Litigation – MDL-1928
Case No. 08-MD-1928-MIDDLEBROOKS/JOHNSON**

**United States District Court
Southern District of Florida**

James R. Ronca
Email: jronca@anapolschwartz.com
**ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN
 & SMALLEY, P.C.**
1710 Spruce Street
Philadelphia, PA 19103
Telephone: 215-790-4584
Facsimile: 215-875-7701
*Co-Lead Counsel for Plaintiffs*

Theodore Babbitt
Email: tedbabbitt@babbitt-johnson.com
**BABBITT JOHNSON OSBORNE
 & LECLAINCHE, P.A**.
1641 Worthington Road, Suite 100
West Palm Beach, FL 33409
Telephone: 561-684-2500
Facsimile: 561-684-6308
*Liaison Counsel for Plaintiffs*

Barry Hill
Email: bhill@htwlaw.us
**HILL WILLIAMS PLLC**
89 12th Street
Wheeling, WV 26003
Telephone: 304-233-4966
Facsimile: 304-233-4969
*Counsel for Plaintiff Crystal Fast*

Scott A. Love
Email: slove@triallawfirm.com
**CLARK BURNETT LOVE & LEE, GP**
Lyric Center
440 Louisiana Street, Suite 1600
Houston, TX 77002
Telephone: 713-757-1400
Facsimile: 713-759-1217
*Co-Lead Counsel for Plaintiffs*

Neal L. Moskow
Email: neal@urymoskow.com
**URY & MOSKOW, LLC**
883 Black Rock Turnpike
Fairfield, CT 06825
Telephone: 203-610-6393
Facsimile: 203-610-6399
*Federal-State Liaison for Plaintiffs*

Brian H. Barr
Email: bbarr@levinlaw.com
K. Lea Morris
Email: lea.morris@levinlaw.com
Kimberly R. Lambert
Email: klambert@levinlaw.com
**LEVIN PAPANTONIO THOMAS MITCHELL
 ECHSNER RAFFERTY & PROCTOR PA**
316 S. Baylen St., Suite 600
Pensacola, FL 32502
Telephone: 850-435-7000
Facsimile: 850-435-7020
*Counsel for Plaintiff Crystal Fast*

Patricia E. Lowry
Florida Bar No. 332569
Email: plowry@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401-6198
Telephone:  561-650-7200
Facsimile:   561-655-1509
*Liaison Counsel for Defendants*